FIRST NATIONAL BANK OF ATLANTA, AS SUCCESSOR IN INTEREST TO FIRST NATIONAL BANK OF CARTERSVILLE, GEORGIA v. BARTOW COUNTY BOARD OF TAX ASSESSORS ET AL.

No. 83–1620. Argued October 30, 1984—Decided March 19, 1985

584

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Charles T. Zink* argued the cause for appellant. With him on the briefs was *L. Trammell Newton, Jr.*

*Alan I. Horowitz* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Archer, Michael L. Paup,* and *Ernest J. Brown.*

*Grace E. Evans,* Assistant Attorney General of Georgia, argued the cause for appellees. With her on the brief were *Michael J. Bowers,* Attorney General, *James P. Googe, Jr.,* Executive Assistant Attorney General, *H. Perry Michael,* First Assistant Attorney General, *Verley J. Spivey,* Senior Assistant Attorney General, *James C. Pratt,* Assistant Attorney General, and *G. Carey Nelson.**

*\*Marvin S. Sloman, Brian M. Lidji, Peter S. Chantilis, Cecilia H. Morgan, Christopher G. Sharp,* and *Bruce W. Bowman, Jr.,* filed a brief for American Bank & Trust Co. et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Commonwealth of Pennsylvania by *John P. Krill, Paul A. Adams,* and *George T. Bell;* for Citizens and Southern National Bank by *John L. Coalson, Jr.;* for the County of Dallas, Texas, et al. by *Earl Luna, Randel B. Gibbs,* and *Tim Kirk;* for the Pennsylvania Bankers Association by *John J. Brennan* and *P. J. DiQuinzio;* and for the Virginia Bankers Association by *John W. Edmonds III* and *Fred W. Palmore III.*

JUSTICE BLACKMUN delivered the opinion of the Court.

Two Terms ago, this Court, by a 6–2 vote, ruled that Rev. Stat. § 3701, as amended, 31 U. S. C. § 742 (1976 ed.), prohibited a State from imposing on bank shares a property tax computed on the basis of the bank's net worth without deduction for tax-exempt United States obligations held by the bank. *American Bank & Trust Co.* v. *Dallas County*, 463 U. S. 855 (1983). Section 3701 at that time provided:[1]

> "[A]ll stocks, bonds, Treasury notes, and other obligations of the United States, shall be exempt from taxation by or under State or municipal or local authority. This exemption extends to every form of taxation that would require that either the obligations or the interest thereon, or both, be considered, directly or indirectly, in the computation of the tax, except nondiscriminatory franchise or other nonproperty taxes in lieu thereof imposed on corporations and except estate taxes or inheritance taxes."

In this case, we address a question left open in *American Bank*, see 463 U. S., at 865, n. 10: must a State, for property tax purposes, allow a bank to deduct from net worth the full value of tax-exempt United States obligations it holds, or is § 3701 satisfied by a limited deduction that excludes from net worth only that portion of the federal obligations properly attributable to assets rather than to liabilities?

## I

Effective January 1, 1980, the State of Georgia imposed a property tax on the fair market value of the shares of the

---

[1] Title 31 of the United States Code was not enacted into positive law until 1982, when it was reformulated, it was said, "without substantive change." See Pub. L. 97–258, § 4(a), 96 Stat. 1067. Section 3701, as it had been amended by an addition in 1959, see Pub. L. 86–346, § 105(a), 73 Stat. 622, 31 U. S. C. § 742 (1976 ed.), was replaced in the 1982 reformulation by 31 U. S. C. § 3124(a). Because the tax at issue here was levied in 1980, the pre-1982 form of the statute technically controls this case.

stockholders of banks and banking associations. 1978 Ga. Laws, No. 795, § 2, p. 523, codified as Ga. Code Ann. § 48–6–90(a)(1) (1982).[2] The fair market value of a bank's shares was to be determined "by adding together the amount of the capital stock, paid-in capital, appropriated retained earnings, and retained earnings . . . as shown on the unconsolidated statement of condition of the bank . . . and dividing the sum by the number of outstanding shares . . . ." This fair market value represented the bank's net worth. The State allowed banks, in the calculation of net worth, to deduct certain holdings, such as real estate taxed separately, § 48–6–90(a)(1), but did not authorize a deduction for the value of United States obligations held by the bank.

When appellant's predecessor-in-interest bank filed its 1980 amended return, entitled "Determination of Taxable Value of Bank Shares," with appellee Bartow County Board of Tax Assessors, it deducted from its net worth the total value of the federal securities the bank held. App. A–4. The Board disallowed that deduction, and the Board of Tax Equalization affirmed the disallowance. Appellant then took its case to the Superior Court of Bartow County, which consolidated it with cases filed by two other banks: Citizens and Southern National Bank, whose deduction of United States securities the Board of Tax Equalization also had disallowed, and Bartow County Bank, whose deduction a different panel of the same Board had allowed. The Superior Court ruled in favor of disallowance, and the Supreme Court of Georgia affirmed. *Bartow County Bank* v. *Bartow County Bd. of Tax Assessors*, 248 Ga. 703, 285 S. E. 2d 920 (1982).

The banks appealed to this Court; we vacated the judgment and remanded the case for reconsideration in light of

---

[2] Effective January 1, 1984, the 1978 statute was repealed and replaced by another providing that "depository financial institutions shall be subject to all forms of state and local taxation in the same manner and to the same extent as other business corporations in Georgia." 1983 Ga. Laws, No. 524, § 5, p. 1355, codified as Ga. Code Ann. § 48–6–90 (Supp. 1984).

the then-recent decision in *American Bank, supra*. *Bartow County Bank* v. *Bartow County Bd. of Tax Assessors*, 463 U. S. 1221 (1983). On the remand to the Supreme Court of Georgia, the parties conceded that the Georgia bank-share tax statute, if construed to prohibit any deduction for the value of federal obligations a bank holds, would be invalid under the principles announced in *American Bank*. The court therefore sought to save the statute by construing it to allow a bank to deduct from its net worth "the percentage of assets attributable to federal obligations." *Bartow County Bank* v. *Bartow County Bd. of Tax Assessors*, 251 Ga. 831, 834, 312 S. E. 2d 102, 105 (1984). The court explained that if 9.75 percent of a bank's total assets consisted of federal obligations, the bank would be entitled to reduce its net worth by 9.75 percent. *Id.*, at 835–836, 312 S. E. 2d, at 106. According to the court, such a proportionate deduction recognizes that some of a bank's federal obligations are represented on the bank's balance sheet by liabilities, while some are represented by net worth.[3] Because the bank-share tax is assessed on net worth, not on total assets, the court reasoned, a proportionate deduction immunizes tax-exempt values, for it excludes federal obligations from the tax base—net worth—to the extent that they are represented there. *Id.*, at 833, 312 S. E. 2d, at 105. The court rejected the banks' argument that the total value of federal obligations had to be deducted from net worth in order for § 3701 to be satisfied; it indicated that such an absolute deduction would not only insulate the federal obligations from the share tax, as § 3701 requires, but would go beyond § 3701 and shelter the bank's taxable assets from the tax. *Id.*, at 834, 312 S. E. 2d, at 105.[4]

---

[3] The court declined to decide whether Rev. Stat. § 3701 would entitle a bank to a full deduction if it could prove that its federal obligations were "actually purchased from capital stock or surplus." 251 Ga., at 834, n. 3, 312 S. E. 2d, at 105, n. 3.

[4] Some States have provided for a pro rata deduction similar to that formulated by the Georgia Supreme Court, either by statute or by adminis-

One of the three banks, appellant First National Bank of Atlanta, appealed.[5] We noted probable jurisdiction pursuant to 28 U. S. C. § 1257(2). 467 U. S. 1214 (1984).

## II

Until 1959, Rev. Stat. § 3701 provided in pertinent part: "[A]ll stocks, bonds, Treasury notes, and other obligations of the United States, shall be exempt from taxation by or under State or municipal or local authority." In that year, however, Congress added a second sentence to § 3701: "This exemption extends to every form of taxation that would require that either the obligations or the interest thereon, or both, be considered, directly or indirectly, in the computation of the tax," with certain exceptions not relevant here. Pub. L. 86–346, § 105(a), 73 Stat. 622, 31 U. S. C. § 742 (1976 ed.). In *American Bank*, this Court stated that § 3701, as amended, provided a "sweeping" exemption for federal obligations, 463 U. S., at 862, and that the word "considered" in the second sentence of § 3701 means "taken into account, or included in the accounting." *Ibid.* Appellant contends that those statements preclude the pro rata deduction approved by the Georgia Supreme Court because they must be read to mean that unless federal obligations are excluded in full from the total assets before net worth is determined, they are "taken into account or included" in the tax computation, and therefore § 3701 is violated.

Contrary to appellant's arguments, however, *American Bank*'s definition of "considered," when read in proper con-

---

trative practice. See, *e. g.*, Pa. Stat. Ann., Tit. 72, § 7701.1 (Purdon Supp. 1984–1985); Texas Research League, Status of the Texas Bank Shares Tax, A Report to the Joint Select Committee (of the Texas Legislature) on Fiscal Policy 11–12 (1984).

[5] Another of the three banks, Citizens and Southern National Bank, now has changed its position and has filed a brief *amicus curiae* in support of appellees.

text, does not dispose of the question here. The issue in *American Bank* was whether a bank-share tax is a form of tax to which § 3701 applies. As was noted in *American Bank*, this Court, prior to the 1959 addition to § 3701, consistently had held that § 3701 prohibited taxes imposed on federal obligations, but did not prohibit nondiscriminatory taxes imposed on other property interests such as corporate shares, even though the value of the interest was measured by underlying assets, including federal obligations. 463 U. S., at 858. The 1959 addition "rejected and set aside" that "rather formalistic pre-1959 approach to § 3701." *Id.*, at 862. The 1959 addition made clear that a tax that does not provide an exemption for federal obligations "is barred regardless of its *form* if federal obligations must be considered, either directly or indirectly in *computing* the tax" (emphasis in original). *Ibid.* *American Bank* therefore addressed the forms of taxation that must allow an exemption for federal obligations; it did not examine the scope of the exemption that must be provided.

### III

An analysis of the scope of the exemption that § 3701 requires must begin with *Missouri ex rel. Missouri Ins. Co.* v. *Gehner*, 281 U. S. 313 (1930). In that case this Court struck down, as violative of § 3701, a Missouri tax imposed upon the personal property of an insurance company. The tax base at issue in *Gehner* was calculated as follows: (1) the value of tax-exempt bonds held by the insurer was subtracted from total assets to determine total taxable assets; (2) total taxable assets were divided by total assets to obtain the ratio of total taxable assets to total assets; (3) that percentage figure was multiplied by total liabilities; and (4) the pro rata portion of liabilities was subtracted from total taxable assets to determine taxable net worth, upon which the tax was based. The Court held that the pro rata deduction violated § 3701 because it made the ownership of United States bonds the

basis for denying a full deduction of liabilities, and thereby increased the tax burden of the taxpayer. The Court drew support for its holding from the recognized principle that "a State may not subject one to a greater burden upon his taxable property merely because he owns tax-exempt government securities." *Id.*, at 321, citing *National Life Ins. Co.* v. *United States*, 277 U. S. 508 (1928).

Justice Stone, in sharp dissent, joined by Justices Holmes and Brandeis, stated that he would have held that the State "does not infringe any constitutional immunity by requiring liabilities to be deducted from all the assets, including tax exempt bonds . . . ." 281 U. S., at 323. He argued that the Court's holding ignored the fact that tax-exempt federal obligations are, in part, liable for the debts of the taxpayer, and that the Court incorrectly assumed that tax-exempt securities alone contributed to the taxpayer's net worth. He also thought the Court's conclusion that the taxpayer's ownership of exempt bonds increased the taxpayer's tax burden was not supportable. He pointed out that a taxpayer who had $200,000 in taxable capital and $100,000 in liabilities had a tax base of $100,000, while a taxpayer who held $100,000 in taxable assets, $100,000 in tax-exempt bonds, and $100,000 in liabilities had a tax base of only $50,000 after the pro rata deduction. The latter taxpayer's liability therefore was reduced, not increased, by ownership of exempt bonds. Justice Stone also pointed out that the full-deduction method adopted by the Court allowed a taxpayer to shelter taxable assets by purchasing an equivalent amount of Government bonds. The full deduction therefore did more than immunize the bonds from taxation; it "confers upon that ownership an affirmative benefit at the expense of the taxing power of the state, by relieving the [taxpayer] from the full burden of taxation on net worth to which his taxable assets have in some measure contributed." *Id.*, at 328.

One must concede that were *Gehner* still an authoritative decision, it would control this case, because it indicates that

anything less than a full deduction for federal obligations fails to provide the tax exemption required by § 3701 and the Constitution. *Gehner*, however, has no vitality today, for the Court has adopted the views expressed by Justice Stone. JUSTICE WHITE, writing for a unanimous Court, has stated flatly that *Gehner*'s extension of the principles of immunity to "condemn more than an increase in the tax rate on taxable dollars for those owning exempt securities" was "soon repudiated." *United States* v. *Atlas Life Ins. Co.*, 381 U. S. 233, 245 (1965). And just one Term after *Gehner* was decided, the Court upheld provisions of the Revenue Act of 1921 that allowed taxpayers to exclude from gross income interest received on state or municipal obligations, and to take a deduction for interest paid on indebtedness, *except* interest paid on indebtedness incurred or continued to purchase tax-exempt obligations. *Denman* v. *Slayton*, 282 U. S. 514 (1931). In *Denman*, the taxpayer argued that the principles of *National Life Ins. Co.* v. *United States*, *supra*, as reaffirmed and applied in *Gehner*, required that the taxpayer be allowed both an exemption for the interest received on tax-free obligations and a deduction for the interest paid. The Court held to the contrary: "While guaranteed exemptions must be strictly observed, this obligation is not inconsistent with reasonable classification designed to subject all to the payment of their just share of a burden fairly imposed." 282 U. S., at 519. Echoing Justice Stone's *Gehner* dissent, 281 U. S., at 328, the Court noted that under the taxpayer's theory of immunity, he could shelter taxable income by the simple expedient of purchasing exempt obligations with borrowed money and paying interest equivalent to the taxable income. 282 U. S., at 519–520. Similarly, in *Helvering* v. *Independent Life Ins. Co.*, 292 U. S. 371 (1934), the Court upheld provisions of the Revenue Acts of 1921 and 1924 that permitted deduction of depreciation and expenses of buildings owned by life insurance companies only on condition that the company include in its gross income the otherwise nontaxable rental value of the

space it occupied. The Court stated that the condition did not amount to a tax upon the tax-exempt rental value, but merely was a permissible "apportionment of expenses." *Id.,* at 381.

In *United States* v. *Atlas Life Ins. Co., supra,* a unanimous Court "affirm[ed] the principle announced in *Denman* and *Independent Life* that the tax laws may require tax-exempt income to pay its way" by upholding the pro rata deduction provisions of the Life Insurance Company Income Tax Act of 1959 (hereinafter Life Insurance Tax Act). 381 U. S., at 247. Under those provisions, a life insurance company's investment income is divided into the policyholders' share, which is not taxed, and the company's share, which is taxed, and a company is allowed to deduct only its share of tax-exempt interest from its gross income. The Court rejected the argument that the insurer should be allowed to deduct not only its share, but the full amount of exempt interest earned, by reasoning like that of the *Gehner* dissent:

> "Undoubtedly the 1959 Act does not wholly ignore the receipt of tax-exempt interest in arriving at taxable investment income. The . . . company will pay more than it would if it had the full benefit of the exclusion for [the policyholders' reserve] and at the same time could reduce taxable income by the full amount of exempt interest. But this result necessarily follows from the application of the principle of charging exempt income with a fair share of the burdens properly allocable to it. In the last analysis Atlas' insistence on both the full reserve and exempt-income exclusions is tantamount to saying that those who purchase exempt securities instead of taxable ones are constitutionally entitled to reduce their tax liability and to pay less tax per taxable dollar than those owning no such securities. The doctrine of intergovernmental immunity does not require such a benefit to be conferred on the ownership of municipal bonds." 381 U. S., at 251.

In sum, ever since *Gehner*, each time this Court has addressed the scope of the tax exemption for Government obligations, it has concluded that the exemption need not be a total exclusion, but, instead, may be limited by charging tax-exempt obligations and interest their fair share of related expenses or burdens.[6] Appellant seeks to avoid the import of these cases by arguing that they were addressed to the tax immunity required by the Constitution, see *Weston* v. *City Council of Charleston*, 2 Pet. 449 (1829), rather than to the requirements of § 3701. It is true that § 3701 was not directly at issue in *Atlas Life, Independent Life*, or *Denman*, and that *Atlas Life* did note that *Gehner* had been discredited "insofar as *Gehner* rested on a doctrine of implied constitutional immunity." 381 U. S., at 245, n. 16. But this Court consistently has "treated [§ 3701] as principally a restatement of the constitutional rule." *Memphis Bank & Trust Co.* v. *Garner*, 459 U. S. 392, 397 (1983). See also *Society for Savings* v. *Bowers*, 349 U. S. 143, 144 (1955); *New Jersey Realty Title Ins. Co.* v. *Division of Tax Appeals*, 338 U. S. 665, 672 (1950).

## IV

The 1959 addition to § 3701 did not broaden the scope of the exemption required by § 3701 beyond that mandated by the Constitution, as interpreted in *Atlas Life, Denman*, and *Independent Life*. The sparse legislative history of the addition certainly provides no support for the assertion that

---

[6] This Court, in *Schuylkill Trust Co.* v. *Pennsylvania*, 296 U. S. 113 (1935), struck down a state-trust-company share tax that provided a pro rata deduction for tax-exempt securities. That decision, however, rested on the fact that the tax discriminated against federal obligations by allowing a deduction for the value of shares the trust company held in corporations that already had been taxed or were exempt from taxes, without allowing a like deduction for federal obligations and shares the trust company held in national banks. The Court did not reach the issue whether, *absent* such discrimination, a pro rata deduction for federal obligations would have satisfied the Constitution or § 3701. The decision, therefore, is of no controlling relevance here.

Congress intended to provide a broader exemption. We noted in *American Bank*, 463 U. S., at 865–866, that the catalyst for the amendment was an Idaho tax imposed upon an individual "according to and measured by his net income." See Idaho Code § 63–3011 (1948). Even though this Court had ruled that § 3701 precluded the States from taxing interest on federal obligations, Idaho took the position that it need not exempt the interest received on federal obligations from the "gross income" from which taxable net income was derived. Noting Idaho's stance, the Senate and House Reports on the 1959 addition stated: "The bill . . . makes it clear that the exemption for Federal obligations extends to every form of taxation that would require either the obligation, or the interest on it, or both to be considered directly or indirectly in the computation of the tax." S. Rep. No. 909, 86th Cong., 1st Sess., 8 (1959); H. R. Rep. No. 1148, 86th Cong., 1st Sess., 8 (1959). The discussion of the addition in the ensuing hearings confirms that Congress intended to abolish the formalistic distinction between taxes *on* income and taxes *measured by* income that underlay Idaho's arguments. See Public Debt Ceiling and Interest Rate Ceiling on Bonds, Hearings before the House Committee on Ways and Means, 86th Cong., 1st Sess., 69–72 (1959) (supplemental statement of Secretary of the Treasury Robert B. Anderson). Appellant points to nothing in the legislative history indicating that Congress understood the addition actually to broaden the scope of the exemption, as well as to clarify the forms of taxes to which the exemption applied.

Congress enacted the pro rata deduction upheld in *Atlas Life* just three months before adopting the 1959 addition to § 3701. Its deliberations over the Life Insurance Tax Act included extended debate whether the pro rata deduction included in that Act satisfactorily protected tax-exempt values. See *Atlas Life*, 381 U. S., at 240–242. In deciding that the pro rata deduction was adequate, Congress rejected the ar-

gument that *Gehner* prohibited pro rata deductions. Given this almost contemporaneous rejection of arguments founded on *Gehner*'s construction of § 3701, see *United States* v. *American Building Maintenance Industries*, 422 U. S. 271, 277 (1975), it does not make sense to assume that, in amending § 3701, Congress intended *sub silentio* to broaden the required exemption to preclude pro rata deductions.[7]

Further, as the *Gehner* dissent, *Denman*, and *Atlas Life* recognized, if banks are allowed to deduct from their assets both federal obligations and the liabilities fairly chargeable to those federal obligations, their ownership will shelter taxable income. In 1959 many, if not most, commercial banks held sufficient federal obligations to shelter their taxable assets completely.[8] Therefore, to presume that Congress intended to prohibit a pro rata deduction in the 1959 addition, we also would have to presume that Congress intended virtually to eliminate the usefulness of share taxes, the prevailing form of

[7] It is also worthy of note that the Treasury Department advised Congress that the pro-rata-deduction provisions of the Life Insurance Tax Act of 1959 did not result in the imposition of any tax on the tax-exempt interest insurers received on state and municipal bonds. 105 Cong. Rec. 8402 (1959) (letter from David A. Lindsay, Assistant to the Secretary of the Treasury, to Senator Harry F. Byrd, Chairman of the Senate Committee on Finance). Only a few months later, the same Treasury Department made no mention of any intent to revise § 3701 to prohibit such a pro rata deduction, and, instead, described the addition to § 3701 as intended merely to resolve the controversy over Idaho's attempt to distinguish between a tax on exempt interest and a tax measured by exempt interest. Public Debt Ceiling and Interest Rate Ceiling on Bonds, Hearings before the House Committee on Ways and Means, 86th Cong., 1st Sess., 69–72 (1959) (supplemental statement of Secretary of the Treasury Robert B. Anderson).

[8] In 1960, commercial banks held $61.1 billion in United States Treasury securities, while they had equity capital of only $21 billion. Senate Committee on Banking, Housing and Urban Affairs, Board of Governors of the Federal Reserve System, State and Local Taxation of Banks, Report of a Study Under Public Law 91–156, 92d Cong., 1st Sess., Part III, p. 12 (Comm. Print 1971) (hereinafter Report of a Study).

state taxation of banks in 1959.[9]  We will not infer such an intent from the sparse discussions of Idaho's troublesome income tax that constitute the entire legislative history of the 1959 addition.  We hold instead that § 3701, as amended, provides an exemption no broader than that which the Constitution requires.

## V

We see no need to depart from the principle established in *Atlas Life* that a pro rata deduction that does no more than allocate to tax-exempt values their "just share of a burden fairly imposed" is constitutional.  381 U. S., at 251.  There is little to add to the persuasive arguments for upholding such a pro rata deduction made by Justice Stone in his dissent in *Gehner*, and by JUSTICE WHITE, writing for a unanimous Court in *Atlas Life*.

Appellant asserts that a different rule is required here because allowing a pro rata deduction will decrease the investment attractiveness of federal obligations.  See *Smith* v. *Davis*, 323 U. S. 111, 117 (1944).  The validity of that proposition, in our view, is highly questionable.  Were federal obligations permitted to shelter taxable assets, the States likely would be unable to raise worthwhile revenues through bank share taxes.  In that event, one would expect that the States would move to tax banks through franchise or other nonproperty taxes specifically excepted from the proscriptions of § 3701.  Counsel for the United States as *amicus curiae* in support of appellant stated at oral argument that the Federal Government does not know if such franchise taxes would result in a greater or lesser burden upon federal obligations.  Tr. of Oral Arg. 18.  It is far from clear, therefore, that the pro rata deduction would diminish the attractiveness of federal obligations more than the alternative taxes the States

---

[9] In 1958, 27 States imposed bank share taxes and 21 States taxed banks through excise, franchise, or income taxes.  S. Leland, The History and Impact of Section 5219 on the Taxation of National Banks, reprinted in Report of a Study 309, 316.

would adopt were a full deduction required. Indeed, banks and banking associations have filed briefs as *amici curiae* in support of Georgia's position here, in part because they fear that a decision striking down the pro rata deduction would result in uncertainty and increased costs to the banks as States adopt other forms of taxation. See, *e. g.*, Brief for Pennsylvania Bankers Association, Brief for Virginia Bankers Association, and Brief for Citizens and Southern National Bank. Furthermore, appellant and its *amici* point to no evidence indicating that the difference in cost to the banks between a pro rata deduction and a full deduction is significant enough to prompt banks to forgo the advantages of federal obligations, such as their extreme liquidity and safety, and to invest their money elsewhere. See Brief for Pennsylvania Bankers Association as *Amicus Curiae* 15–18; Brief for Citizens and Southern National Bank as *Amicus Curiae* 8–10.

The tax exemption required by the Constitution and § 3701 is not a tax shelter. Federal obligations may be acquired, in part, by liabilities, and, when they are, a pro rata method of allocating a fair share of the federal obligations to liabilities does not infringe upon the constitutional or statutory immunity federal obligations enjoy.

The judgment of the Supreme Court of Georgia is affirmed.

*It is so ordered.*